1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2
     ---------------------------------x
3    JASON BERGER,

4                           Plaintiff,

5                                Case No. 18-cv-08956
          -vs-
6
     IMAGINA CONSULTING, INC.,
7
                           Defendant.
8
     ---------------------------------x
9
                                United States Courthouse
10                              White Plains, New York

11                              April 18, 2019
                                12:13 p.m.
12

13   B e f o r e :
                                HONORABLE CATHY SEIBEL
14
                                District Judge
15

16   A P P E A R A N C E S :

17   LIEBOWITZ LAW FIRM, PLLC
          Attorney for Plaintiff
18        11 Sunrise Plaza
          Suite 305
19        Valleystream, New York 11580
     BY:  RICHARD LIEBOWITZ
20        (Appearing via telephone)

21   ALBERT PLLC
          Attorneys for Defendant
22        733 Third Avenue
          Fifteenth Floor
23        New York, New York 10017
     BY:  CRAIG J. ALBERT
24        (Appearing via telephone)

25

 1            THE COURT:  We are on the record with the court

 2  reporter.  So this conference was originally on for the 12th,

 3  and Mr. Liebowitz did not come.  I understand you had a death in

 4  the family, which I am sorry to hear about.  Did that come up

 5  just that morning?

 6            MR. LIEBOWITZ:  Yes, it did.

 7            THE COURT:  I am sorry for your loss, but --

 8            MR. LIEBOWITZ:  Thank you, Your Honor.

 9            THE COURT:  But I hope that in the future you would at

10  least arrange for somebody to give Mr. Albert a call because he

11  spent, you know, half a day coming up here and waiting around

12  and going back.

13            MR. LIEBOWITZ:  Yes.  Yes.  That I apologize to

14  opposing counsel for.

15            THE COURT:  Nowadays there is really no barrier to

16  immediate notification.  The conference was prompted by

17  Mr. Albert's April 5th letter regarding discovery, and I have

18  Mr. Liebowitz's April 9th response, which prompted as many

19  questions as it answered.

20            So let me ask some questions:  The -- as I understand

21  it, the plaintiff's interrogatory responses said that the

22  plaintiff was seeking $5,000 for each alleged infringement, and

23  the basis for that was contracts, invoices, licensing

24  agreements; and then when plaintiff asked for those documents --

25  excuse me -- when defendant asked for those documents, plaintiff

 1  said, he doesn't have any.

 2          So I don't understand what plaintiff meant in the

 3  interrogatory answer when he said he based his loss calculation

 4  on contracts, invoices and licensing agreements.

 5          MR. LIEBOWITZ:  Yes.  So I guess I would have to

 6  clarify exactly what that meant.  So my client takes head shots.

 7  It's not a license.  It's basically, you know, someone that

 8  comes to him and says, hey, you know, I want to buy these head

 9  shots.

10          THE COURT:  Yes.

11          MR. LIEBOWITZ:  So sort of like it's a buyout.

12          THE COURT:  I understand that.  My question was:

13  Somebody wrote in the interrogatories that the $5,000 figure

14  came from contracts, invoices and licensing agreements.  So I

15  assume that somebody had -- wasn't just pulling that out of thin

16  air and had a basis for it.  Where does that come from?

17          MR. LIEBOWITZ:  Well, we were going to get

18  comparables, what other people would license it for.  That's

19  what we meant by that.  Sort of like an actual license.

20          THE COURT:  Okay.  You were going to get comparables,

21  but you didn't have them, and so I think a truthful answer to

22  that question would have been:  We picked $5,000 out of thin

23  air.  I mean, you know, it can't be both that you base the

24  number on information and that you don't have the information.

25          So what makes you think that there will be comparables

```
 1  out there that would support a $5,000 figure?

 2          MR. LIEBOWITZ:  Yeah, because, I mean, I have other

 3  clients that also shoot similar things, and I have seen that

 4  before.

 5          THE COURT:  Hold on.  You are breaking up.  You are

 6  not a cell phone, are you?

 7          MR. LIEBOWITZ:  I am on a cell phone because I am out

 8  of town.

 9          THE COURT:  This is why I don't like to do phone

10  conferences.  Can you say what you were going to say again

11  slowly?

12          MR. LIEBOWITZ:  Oh, yes.  Oh, yes.  So I -- other

13  clients of mine have licensing for around 5,000.  So if you want

14  a benchmark license, we would produce those.  In terms of him,

15  you know, he has -- he doesn't have licensing.  He just does a

16  buyout for head shots.

17          So in this particular case what happened was the

18  subject matter in the photograph did not agree to the buyout,

19  and my client had to return the money because she didn't agree

20  to the buyout, and I sent opposing counsel the agreement that

21  wasn't signed, but it was proposed.  And, you know, the subject

22  matter could have done whatever she wanted with the actual

23  photograph for her use, but she decided not to, and that's where

24  this whole case flows from.

25          THE COURT:  I am sorry.  You lost me.  What buyout are
```

1  you talking about?

2        MR. LIEBOWITZ:  I am talking about when my client

3  takes head shots, right, what happens generally is that the

4  subject matter could use it for different purposes.

5        THE COURT:  Right.

6        MR. LIEBOWITZ:  And that's considered a buyout.

7        Now in this particular case, the subject matter did

8  not agree to the buyout, and my client had to return the money.

9        THE COURT:  I am sorry.  I am still lost.  If I go to

10 your client and I buy head shots, he takes the pictures, and I

11 can do what I want with them?

12        MR. LIEBOWITZ:  Yes.  You can.

13        THE COURT:  So what's the buyout mean?

14        MR. LIEBOWITZ:  For personal use.  Meaning let's say

15 if you go to a -- say, like an audition, right?  Or if you use

16 it on your website, you know, for those particular uses, you

17 know, if the particular person needed to, you know, give it to a

18 third party, you know, there would have to be inquiries to see

19 whether or not the photographer would allow that.

20        THE COURT:  Again, I am having a very difficult time

21 understanding you.  I can use those head shots for my purposes,

22 but if I give them to a third party, what?

23        MR. LIEBOWITZ:  Then the photographer would have to be

24 contacted to ask that, could that particular use be allowed.

25 And sometimes he may allow it or sometimes he would say, no.

PROCEEDINGS                                    6

1  There would have to be an additional fee.  It depends.

2         THE COURT:  I am sorry.  I don't mean to be dense.  I

3  really don't, but we are talking -- if I understand it -- I go

4  to you and I get my head shots taken, and then I can do what I

5  want with them, and if I want to give them to a third party, I

6  have to get the photographer's permission?

7         MR. LIEBOWITZ:  Yes.

8         THE COURT:  Or if a photographer wants to give them to

9  a third party, he has to get my permission?

10        MR. LIEBOWITZ:  No.  If the subject matter in the

11  photograph wants to give the photograph to a third party, the

12  subject matter has to contact the photographer and say I -- I

13  want to give the photographs to a third party.  Are you going to

14  charge for that?

15        THE COURT:  Okay.  And then what happens?

16        MR. LIEBOWITZ:  Then the photographer would then say,

17  okay, X amount is the fee for the third party use, and you could

18  use it.  So you have to pay.

19        So in this particular case, there was -- there wasn't

20  any of that because the subject matter in the photograph did not

21  even agree to the terms of the -- of the buyout.

22        THE COURT:  So let's say she doesn't agree, but then

23  she gives the money -- and she gives the pictures to the third

24  party anyway, then your beef is with the subject of the picture,

25  not the third party, right?

1          MR. LIEBOWITZ:  No.  Because the third party is also

2    liable for copyright infringement for the strict liability.  So

3    the third party could then say, hey, subject matter who gave me

4    the photograph, they could be indemnified.  They could go back

5    to the subject matter and say, hey, you gave it to me.  You

6    know, now we have a claim for copyright infringement.  You have

7    to pay for it.

8          THE COURT:  All right.  So this leads me back to my

9    question, which is:  Your client knows what fee he would have

10   charged.  Why -- I still don't understand where the 5,000 came

11   from or what comparables that the interrogatory response

12   referred to.

13         MR. LIEBOWITZ:  Yes.  So the 5,000 would be for the

14   third party, right?

15         THE COURT:  So your client's routine is he charges

16   $5,000 for third parties to use the pictures?

17         MR. LIEBOWITZ:  No.  He hasn't done that before, but

18   other benchmarks, meaning that other people -- he works in the

19   industry.

20         THE COURT:  I see.

21         MR. LIEBOWITZ:  He works for a lot of photographers, a

22   third party.

23         THE COURT:  Has he ever charged anyone for a third

24   party use?

25         MR. LIEBOWITZ:  No.

 1          THE COURT:  And is that because no one has ever asked

 2  or he has always said, go ahead and do it for free?

 3          MR. LIEBOWITZ:  No.  It's because no one ever asked

 4  and this situation had never really come up before because no

 5  one -- the third party -- so the subject matter in the

 6  photograph, you know, you know, wanted all the money returned

 7  for, you know, the head shots and that's where we are today.  I

 8  mean, if the subject matter and the third party, which is the

 9  defendant in this action, definitely went to the photographer

10  and said, hey, we want the rights to these photographs, then my

11  client would have said, yes.  $5,000 to use it for the third

12  party for the usage for a particular timeframe.

13          THE COURT:  So the answer to that interrogatory should

14  have been, we have no documents, but we plan to get comparables.

15  Okay.  And then we wouldn't be here having this discussion.

16          MR. LIEBOWITZ:  Yes.

17          THE COURT:  The next question is:  Your -- I don't

18  know, your associate apparently told Mr. Albert that he needed a

19  protective order in order to produce financial related

20  documents, but now you are telling me there are no such

21  documents.  So --

22          MR. LIEBOWITZ:  No.

23          THE COURT:  -- what was the protective order about?

24          MR. LIEBOWITZ:  No, no, no.  The protective order is

25  for -- it's for the head shots.  Obviously, my client charges

1  for head shots, right?  Not for licensing.  But for head shots,

2  the buyout.  That's why we needed the protective order, and that

3  now the argument is, why do we need to produce other comparable

4  head shots buyouts because that has nothing do with the

5  photograph at issue.

6          THE COURT:  But you don't have -- now I am even more

7  lost.  You needed a protective order -- your associate said, we

8  can't produce anything until we have a protective order.  And --

9          MR. LIEBOWITZ:  Yes.

10          THE COURT:  -- the thing that you were telling me you

11  need the protective order for is something you don't even have

12  in hand yet.

13          MR. LIEBOWITZ:  Well, because we are disputing whether

14  or not it's relevant to the action.

15          THE COURT:  Well, then you don't falsely claim I have

16  something, but I can't give it to you because I need a

17  protective order first.

18          MR. LIEBOWITZ:  Okay.  So well, listen, my client said

19  that that was confidential.  So --

20          THE COURT:  But what was confidential?  What was

21  confidential?

22          MR. LIEBOWITZ:  The -- what is confidential is the

23  amount of money that is charged for the head shots.

24          THE COURT:  But he doesn't charge -- wait.  Hold on.

25  Hold on.  Let me back up.  Just answer this question:  When your

PROCEEDINGS

1 associate said a protective order was needed before something

2 could be produced, what was the "something"?

3 　　　　　MR. LIEBOWITZ:  Those were other comparables like head

4 shots buyouts.

5 　　　　　THE COURT:  Other comparables like head shots what?

6 　　　　　MR. LIEBOWITZ:  A head shot buyouts, meaning like if

7 he -- this is the difference, right?  The difference is --

8 　　　　　THE COURT:  But you just told me he doesn't have any

9 because this has never happened before.

10 　　　　　MR. LIEBOWITZ:  No, no, no.  You see this is where the

11 confusion comes from, right?  He takes photographs of head

12 shots, right?

13 　　　　　THE COURT:  Right.

14 　　　　　MR. LIEBOWITZ:  He doesn't license the third party.

15 　　　　　THE COURT:  Right.

16 　　　　　MR. LIEBOWITZ:  So the issue here is defendant wants

17 all this information regarding to the buyouts to other

18 photographs.

19 　　　　　THE COURT:  I'm sorry.  I am really, really, really

20 confused, as you can tell.  Your client takes head shots and

21 sells them to people.  Your --

22 　　　　　MR. LIEBOWITZ:  Yes.

23 　　　　　THE COURT:  -- client has never gotten a call from a

24 client saying, I want to give this to a third party; what is the

25 fee?

```
 1              MR. LIEBOWITZ:  Yes.

 2              THE COURT:  So this quote-unquote "buyout" has never

 3  happened?

 4              MR. LIEBOWITZ:  No.  The buyout is with the head

 5  shots, meaning that someone talks to him to do a head shot,

 6  right?  He has done that before for other head shots.  The

 7  license is totally different.  That's for third parties.  That's

 8  different.  That, he has never done before.  He has done the

 9  buyout, obviously, because that's his living.

10              THE COURT:  Listen.  I don't mean to be stupid, and I

11  don't mean to be impatient, but I am completely unable to follow

12  what you are saying.  There is -- so far I have heard about two

13  conceivable transactions:  One is the one your client does where

14  he takes a picture of Jane Doe for a fee, and she gives him

15  money, and he gives her pictures.

16              MR. LIEBOWITZ:  Yes.

17              THE COURT:  That is called what?

18              MR. LIEBOWITZ:  That's called a buyout.

19              THE COURT:  That's called a buyout?

20              MR. LIEBOWITZ:  Yes.

21              THE COURT:  Okay.  And the other conceivable

22  transaction is if Jane Doe wanted to give it to a third party,

23  your client might quote a fee, but that didn't happen and has

24  never happened?

25              MR. LIEBOWITZ:  Yes.
```

```
 1              THE COURT:  So taking the pictures in exchange for
 2   money is called a buyout.  All right?
 3              MR. LIEBOWITZ:  Yes.
 4              THE COURT:  And your client -- your client's position
 5   was he couldn't reveal what he charges for head shots without a
 6   protective order?
 7              MR. LIEBOWITZ:  Yes.  For the buyout.
 8              THE COURT:  Well, that's the only thing he ever sells,
 9   right?
10              MR. LIEBOWITZ:  Exactly.
11              THE COURT:  Okay.  And you got the protective order in
12   place and then promised some documents on March 27th and the
13   balance on April 3rd.  And then as I understand it, what was
14   produced on March 27th was, according to Mr. Albert, screen
15   shots from a website, and that nothing further was produced.
16              So where is all of the stuff covered by the protective
17   order?
18              MR. LIEBOWITZ:  Yes.  So the issue now is whether or
19   not other buyouts, not this one, is relevant to the case.
20              THE COURT:  Well, that's not the issue at all.  The
21   issue is:  You said you were going to be producing stuff that
22   you didn't produce.  You never came to me and said, he's asking
23   me to produce something that's irrelevant.  You promised that
24   you would produce it.  You said you couldn't produce it without
25   a protective order.  You got your protective order.  You didn't
```

1  produce it, and now you are making up some other excuse.

2         MR. LIEBOWITZ:  No.  It's not an excuse.  We just

3  don't find -- why should his history of all of his buyouts from

4  the years of him being a photographer, you know, is relevant.

5  We did produce --

6         THE COURT:  Well, if that's the case, then you are

7  saying to your adversary, I am not producing it because it's not

8  relevant.  You don't say, I have -- I can't produce it without a

9  protective order, and I will produce it on March 27th and then

10  not produce it.

11         MR. LIEBOWITZ:  Okay.  So --

12         THE COURT:  Don't give me an "okay." I mean, are you a

13  lawyer admitted to practice who passed the ethics part of the

14  bar exam?  The way you raise a relevance objection is you say,

15  it's not relevant; I am not producing it.  You don't jerk the

16  other side around and delay by saying, oh, there has to be a

17  protective order or, okay, I am giving it to you next Tuesday

18  and then just not do it, and then when the judge calls you on it

19  say it's not relevant.

20         MR. LIEBOWITZ:  Okay.  So --

21         THE COURT:  You are going to be writing a check at the

22  end of this conference because Mr. Albert, it sounds to me, has

23  been jerked around, and his time has been wasted, and my time

24  has certainly been wasted.

25         I have more questions.  Has your client signed the

1  interogatories yet?

2          MR. LIEBOWITZ:  No.  Not as of yet, but I will have

3  them signed by the end of this week.

4          THE COURT:  And it's going to be a hundred dollars a

5  day for every day that they go unsigned after tomorrow.

6          MR. LIEBOWITZ:  Okay.  I will let him sign it by

7  tomorrow.

8          THE COURT:  And why shouldn't you pay Mr. Albert's

9  costs for this application which sounds like it was a hundred

10  percent unnecessary?

11          MR. LIEBOWITZ:  Well, if we had talked about it over

12  the phone, we could have figured out what was irrelevant and

13  what was relevant.

14          THE COURT:  Yeah, but this is -- you never -- you

15  never -- well, let me ask you a question:  When did you raise

16  the relevance objection?

17          MR. ALBERT:  May I have moment, Your Honor?

18          THE COURT:  I'm sorry.  I cannot hear you, Mr. Albert.

19          MR. ALBERT:  May I chime in for one moment, please?

20          THE COURT:  Yes.  Louder, though.

21          MR. ALBERT:  The relevance objections were never made;

22  and with respect to talking about it, in fact, I did try to talk

23  to him about it when he told me he had been -- the reason that

24  he had been -- he could not comply was that he had been called

25  out of the country on an emergency, and it turned out that he

1   was not out of the country on an emergency.  He was attending a

2   trade show at the United Kingdom photography show in Manchester,

3   England where he was manning a booth trying to drum up more

4   copyright litigation in a jurisdiction where he's not even

5   admitted to practice.

6          I mean, this is just outrageous, Your Honor.  We have

7   a dozen different categories of documents that he has simply not

8   produced, and even with respect to this buyout stuff that he has

9   talked about, there would be a transaction between him and the

10  subject matter of the -- of these photographs telling the

11  subject matter what it is that she is buying and what it is that

12  she can do with that.  I mean, it just -- it simply defies logic

13  to say that the photographer can take heads shots of a person,

14  but that person is then not allowed to make any copies of it

15  because the photographer owns the copyright.  There must be some

16  sort of transaction between them telling the subject matter of a

17  head shot what it is that they could do.

18         And in this case it's not even a question of physical

19  photographs that the photographer -- that the photographer is

20  making because then you could actually sell physical copies.  He

21  was delivering to the subject matter photographs in physical

22  copies.  So what's she supposed to do with it?  She copied them,

23  and she distributes them for the very purpose of what a head

24  shot is for, to illustrate what she looks like.

25         And the client -- the photographer can't possibly be

1   in a position to sell those images to anybody else, and the

2   reason is because if he had the right to sell those things, he

3   would have a model's release from the subject matter of the

4   photograph.  So without a model's release from the subject

5   matter of the photograph, he could not have gotten a dime in

6   licensing these photos.

7            Your Honor, this is just another of these many

8   Liebowitz-slash-trolled copyright cases, and this one is just

9   egregious.

10            THE COURT:  Well, Mr. Liebowitz, do you want to

11   explain why you said you were called out of the country on an

12   emergency when it wasn't an emergency?

13            MR. LIEBOWITZ:  Well, I had to -- I had to go.

14            THE COURT:  I am sorry?

15            MR. LIEBOWITZ:  I had to go.  It was a -- I had to go

16   there.  I had to go overseas so --

17            THE COURT:  Yes, but you are not answering the

18   question.  The question was:  Why did you say you had to leave

19   the country on an emergency if it wasn't an emergency?

20            MR. LIEBOWITZ:  Well, I had to go because that's where

21   someone was supposed to go for me, and I had to go instead.

22            THE COURT:  Well, you know what I am going to need

23   now, I am going to need some evidence that you had a death in

24   the family the other day.  Sorry to do it, but I will need to

25   know who died and when you were notified --

PROCEEDINGS

1          MR. LIEBOWITZ:  Okay.

2          THE COURT:  -- because I am seeing a pattern here

3    where it sounds like you are just trying to run up the costs

4    to --

5          MR. LIEBOWITZ:  Not at all.

6          THE COURT:  -- the defense.  Look, maybe -- maybe I am

7    wrong, but you can assuage my concerns by documenting who died

8    and how you were notified and when the person passed away, and

9    if it was that morning, you know, fine.  But if I find out that

10   the information was in your hands or known to you before the

11   morning of the conference, then you are going to have a problem.

12         So --

13         MR. LIEBOWITZ:  Okay.

14         THE COURT:  -- I -- you know, I am just -- I am just

15   hoping that --

16         MR. LIEBOWITZ:  It's --

17         THE COURT:  -- that there won't be a problem.

18         MR. LIEBOWITZ:  There is no problem.

19         THE COURT:  And you can have your client sign the

20   interrogatories by tomorrow.  You are going to produce

21   100 percent of what's been asked for by Monday.

22         MR. LIEBOWITZ:  Okay.

23         THE COURT:  And if what's been asked for you don't

24   have, you are going to say you don't have it; and if your

25   objection is that it's not relevant, you are going to say it's

1 not relevant; but if you say one more thing that's not true, I

2 am going to dismiss the case and sanction you.

3            And I am also going to sanction you to pay

4 Mr. Albert's fees for this application because if you had simply

5 said to him what you said to me today, he wouldn't have had to

6 bring this application.  If you said, we don't have any

7 contracts, invoices, or licensing agreements, we just plan to go

8 get them, we wouldn't be here.  If you had said, I don't have --

9 if you had produced, once you got the protective order, the

10 information which I don't even know why it's secret, honestly,

11 but fine, the information about what your client charges, which

12 is it seems like "buyouts" is a fancy way of saying what he

13 charges and if you -- I don't see any reason why you can't

14 produce whatever agreement he has with his clients.

15            The way I understand head shots is if I am an actor, I

16 pay a photographer to take head shots for me, and then I give

17 them out to oodles of third parties because I am going on

18 auditions.  I put them on my website.  And it seems very odd to

19 me that I would need to call the photographer every time I went

20 on an audition and sent somebody my head shot.  It's seems very

21 odd to me that if I got a part and they wanted to put my head

22 shot in the lobby of the theater or in the *Playbill*, that I

23 would have to get the photographer's permission; but if that is

24 the agreement your client had with his clients, then you will

25 turn that over.

1          MR. LIEBOWITZ:  Yeah, but the issue in this particular

2   case is that there was no agreement with this -- with the model

3   to begin with because my client had to return the money.

4          THE COURT:  Why did he have to return her money?

5          MR. LIEBOWITZ:  Because the model didn't like the --

6   didn't like the terms of the agreement.  So she --

7          THE COURT:  What agreement are you talking about?

8          MR. LIEBOWITZ:  I am talking about the buyout.  My

9   client provided the buyout agreement to the subject matter, and

10  the subject matter said, no, I don't like it.  Return my money,

11  and he did.

12         THE COURT:  When you say she -- let's talk -- let's

13  drop the terms and let's talk in plain English.

14         She came to him as a customer.  She said, take my

15  picture, so I can use it as head shots.  He took her picture,

16  and then she said give me my money back because? and then fill

17  in that blank.  Why did she want her money back?

18         MR. LIEBOWITZ:  Because she didn't -- not like the

19  buyout that --

20         THE COURT:  Don't use that term.  I don't know what

21  you mean by that term, and it's got me super confused.  Plain

22  English, please.  She went to him.  She said, I want you to take

23  head shots.  He said, I will charge you X.  What else did he

24  say?

25         MR. LIEBOWITZ:  Yes.  And then she said she did not

1   like the agreement.

2           THE COURT:  What agreement?

3           MR. LIEBOWITZ:  The buyout agreement.

4           THE COURT:  What does that cover?  What does it say?

5           MR. LIEBOWITZ:  If -- I produced that to -- I produced

6   that to the defendant.  It said how much money it was, right?

7   And let me see if I have it in front of me.  There were other

8   things in that agreement that she didn't like it.  So she said

9   to return the money, and my client did.  Quite simple.

10          THE COURT:  What -- so he took the pictures --

11          MR. LIEBOWITZ:  No.

12          THE COURT:  -- according to you.

13          MR. LIEBOWITZ:  It happens all the time.  Head shot

14  photographers sometimes have to give refunds if the subject

15  matter doesn't like the agreement.

16          THE COURT:  I have never heard of something where you

17  do the work and then you provide an agreement later.

18          MR. LIEBOWITZ:  Yeah.  That's the --

19          THE COURT:  Well, that's insane.  That makes no sense.

20  If a client comes to a photographer and says, I would like you

21  to take head shots, and he said, okay, it's going to cost this

22  much money, and here are the terms; she either says okay or no,

23  thank you.

24          But if he says it's going to cost this much money and

25  she says, okay, and he takes the pictures, and then he says, oh,

1   by the way, there are all of these other terms, then he is

2   shaking her down.  So what's going on here?  I don't understand

3   what agreement she would learn about after the pictures were

4   taken.

5              MR. LIEBOWITZ:  Your Honor, that's the way the world

6   works.  Hey, sometimes things have to get done and afterwards

7   things are sought.

8              THE COURT:  Say that again.  I couldn't understand

9   you.

10             MR. LIEBOWITZ:  Yes.  I am saying that's the world we

11  live in.  Sometimes things don't get sought right away.  And in

12  this particular case the agreement was sent afterwards, and the

13  subject matter didn't like it, and my client had to return the

14  money.

15             THE COURT:  So why is that not a shakedown?  I

16  don't -- I literally don't get it.

17             MR. LIEBOWITZ:  Well --

18             THE COURT:  If I -- if I, you know, go to get my nails

19  done, and the person says, okay, it's going to be $25.  And then

20  after I get my nails done she says, oh, by the way, you have to

21  stand on one foot for 30 minutes, I am just going to tell her to

22  go to hell.  So --

23             MR. LIEBOWITZ:  Well, it's for a client relations

24  standpoint, you know, if someone is upset about it, you know, he

25  will return the money.

 1          THE COURT:  But what right did your client have after

 2   the -- after he got the money that he asked for to then add new

 3   conditions?

 4          MR. LIEBOWITZ:  Say that one more time.  I couldn't

 5   hear that.

 6          THE COURT:  What right did your client have after he

 7   made an agreement to do the work for a certain amount of money

 8   to add new conditions after it was done?

 9          MR. LIEBOWITZ:  The -- my client was going to send the

10   agreement after the head shots were done.

11          THE COURT:  What right did he have to add new

12   conditions after he agreed to do the work for a certain amount

13   of money?

14          MR. LIEBOWITZ:  Well, what new conditions were there?

15   There were --

16          THE COURT:  Whatever it was that she saw in that

17   contract that she said "hell no" to?  I mean, he must have -- he

18   didn't do it for free, right?

19          MR. LIEBOWITZ:  No, he didn't do it for free.

20          THE COURT:  So he must have had an agreement with her:

21   I will take your head shots in exchange for a certain amount of

22   money.

23          MR. LIEBOWITZ:  Yes.

24          THE COURT:  Let's just keep it simple and say $500.

25   So she shows up thinking that she has an agreement that she's

1  going to get head shots for $500, and your client doesn't

2  disabuse her of that, and then after the pictures are taken, he

3  adds other conditions.  What gives him the right to do that?

4      MR. LIEBOWITZ:  No, people do this all the time.  I

5  mean, they have agreements that are done after the fact, and

6  sometimes the person doesn't agree with them, and my client did

7  the right thing, and he returned the money, you know; and the

8  issue here is now she is going around giving out photographs to

9  third parties after my client returned the money?

10      THE COURT:  Well, I am not opining on whether she had

11  the right to do that.  I just don't understand your client's

12  business model.

13      MR. LIEBOWITZ:  This is the way the world works with

14  photographers today.  This is what I do for a living.  I see it.

15  You know, things -- agreements aren't always done at the

16  beginning of a relationship.

17      THE COURT:  Well, that's a bad way of doing business.

18      MR. LIEBOWITZ:  No.

19      THE COURT:  But, you know, the subject matter is not a

20  party here and, you know, your client's business model is not

21  really my concern.  My concern is moving this case along, and

22  the -- how many images is the plaintiff claiming the defendant

23  infringed here?

24      MR. LIEBOWITZ:  One photo.

25      THE COURT:  One photo?  So the entire value of this

1   case is $5,000 at best?

2           MR. LIEBOWITZ:  Yeah, that's it.  And then we could

3   get this resolved very quickly.  We could all move on.  And my

4   client just wants to get paid.  This is all.  This is what the

5   whole case is about because my client returned the money to the

6   subject matter because she didn't like the agreement, and now

7   next thing you know, the subject matter is giving it out to

8   third parties, and my client didn't get paid for any of this

9   stuff because he returned the money.

10          So simply, my client has just asked for a small amount

11  of money to get this resolved, and we all move on.  I mean --

12          THE COURT:  What's a small amount of money?

13          MR. LIEBOWITZ:  It's like a couple of thousand bucks,

14  and we all move on.  The defendant offered like 800 bucks or

15  something like that.  That's too little.  The cost of the

16  litigation, you know, already involved, the filing fee, you

17  know, and everything like is a 5 or 600 bucks.  Then we could

18  get rid of this whole thing for 2,500 bucks.  We all move on.

19          THE COURT:  Well, you know, the costs of litigation

20  were driven up by your conduct.

21          MR. LIEBOWITZ:  No.

22          THE COURT:  And what you are going to end up paying

23  out of your pocket is going to exceed what your client gets.

24          MR. LIEBOWITZ:  Listen, there was a misunderstanding

25  on what actual, you know, interrogatory stuff and everything

1  like that.  That could have been done on a phone call to work

2  things out.

3           THE COURT:  What are you -- let me just interrupt you

4  to ask:  Are you saying that Mr. Albert never called to try to

5  work it out?

6           MR. LIEBOWITZ:  I don't think.  It was all over email.

7           THE COURT:  And the significance of that distinction

8  is what?

9           MR. LIEBOWITZ:  Well, I would have got -- I would have

10 gotten a phone call.  I mean, a meet-and-confer -- the purpose

11 of meeting and conferring over the phone is to understand, you

12 know, sometimes things in writing don't come across what

13 truly -- you know, what the issue is.

14          THE COURT:  And what was the barrier to you picking up

15 the phone and calling Mr. Albert?

16          MR. LIEBOWITZ:  Yeah, well, listen, you know, things

17 happen in life.

18          THE COURT:  Yes.  Well, that's why you are going to be

19 paying for his time for this application.

20          MR. LIEBOWITZ:  Okay.  I mean, I don't think it's

21 reasonable when we -- you know, you could pick up the phone and

22 we could sort this out.  I would like to try to get the matter

23 resolved today over the phone right now.  I mean, I --

24          THE COURT:  I would be delighted to resolve your

25 client 's matter.  It sounds like -- well, let me ask the

1   question:  Where is it that the defendant published this

2   photograph?

3           MR. LIEBOWITZ:  It was on a website.  It was on a --

4           THE COURT:  What kind of website?

5           MR. LIEBOWITZ:  I don't know exactly what type of

6   website.

7           MR. ALBERT:  Commercial.  She has a website for a

8   holistic healing company, and she had a podcast where she

9   interviewed various interesting people.  She has made $0 from

10  it, and we've produced all of her financial statements which

11  showed $0 in revenue.

12          THE COURT:  So the person in the picture is the

13  principal of this corporation of the defendant?

14          MR. ALBERT:  No.  The -- no.  The -- it's a woman that

15  she was interviewed -- the principal of the Imagina Consulting

16  interviewed the subject matter of this photograph, and it was a

17  sort of tune in to listen to my podcast --

18          THE COURT:  I see.

19          MR. ALBERT:  -- here is a picture of Lena Koropey.

20          THE COURT:  Mr. Liebowitz, what does your client

21  charge for head shots?

22          MR. LIEBOWITZ:  For head shots is generally around

23  $500.

24          THE COURT:  I didn't hear you.

25          MR. LIEBOWITZ:  About 500.

1          THE COURT:  So how could you ask for more than 500?

2          MR. LIEBOWITZ:  Well, because he would be giving it

3    to -- third parties license is different than giving it to

4    someone for personal use for a buyout.

5          THE COURT:  Well, if she had paid the $500 and, yes,

6    retained the right to use these head shots, she could give them

7    to the person who was going to be interviewing her on the air,

8    right?

9          MR. LIEBOWITZ:  No.  That's what I was telling you in

10   the very beginning.  It's two separate -- it's two separate

11   things that the photographers have, right?  You have her head

12   shots to use it for their use like when they go for auditions or

13   if they want to use it in their website, but for third-party

14   usage, right, they have to contact the photographer and say,

15   hey, I am giving it to this third party for this particular

16   usage.  How much do you charge?

17         THE COURT:  How could the -- how could the charge for

18   the third-party usage possibly exceed the charge for the work?

19   I mean, it took them three hours, let's say, to take a thousand

20   pictures of this person, and he charged $500 for that.  Now you

21   are suggesting that for her to give that picture to some obscure

22   website, he can charge 5,000?  That's ridiculous.

23         MR. LIEBOWITZ:  It would be the third party -- the

24   third party would have to buy --

25         THE COURT:  Nobody would ever pay that.

1          MR. LIEBOWITZ:  Well, that's their decision.

2          THE COURT:  Right.  But you are claiming a good-faith

3    basis for damages of $5,000.

4          MR. LIEBOWITZ:  Yes.  Because if a third party came to

5    the plaintiff, right, said, hey, we want to use it on our

6    website, right?  People were going to see it, right?  It's used

7    for commercial purposes, right?  That's one -- that's -- my

8    client has a right to charge whatever he wants.

9          THE COURT:  Well, this isn't being used in a Budweiser

10   commercial during the Super Bowl.  This is being used by some

11   obscure good-health website that nobody is going to see.  There

12   is no way in a million years your client would get $5,000 out of

13   a third party like that.

14         MR. LIEBOWITZ:  I have seen it before.  I represent a

15   lot of photographers.

16         MR. ALBERT:  Your Honor, his client asked the subject

17   of the photograph for $500 in order to reproduce it in print in

18   a nationally distributed *Forbes* magazine that sells millions of

19   copies.  This is -- that was $500 that which she asked.  This

20   couldn't possibly be worth more than 10, 15 bucks.

21         THE COURT:  This case is cuckoo.  I really don't get

22   this at all.  However, here is what I am going to do:  I am

23   going to suggest that you resolve this case for $1,000.

24         MR. LIEBOWITZ:  Okay.

25         THE COURT:  And I am also going to suggest that the

1  longer this conversation goes, the more Mr. Liebowitz is going

2  to be paying for Mr. Albert's time.

3          So I will give you an opportunity, Mr. Liebowitz, to

4  oppose his application, but I've got to say I find that the need

5  for this letter was occasioned completely by misrepresentations

6  or lack of responsiveness on your end.  All you had to do is

7  say, I don't have any such documents.  And all you had to do is

8  say, I don't want to produce these documents because they are

9  not relevant, and then we could have had a discussion on whether

10 they were relevant.

11         But instead, we had a discussion about what was

12 supposed to be produced under the protective order, and you made

13 a promise you were going to deliver some things on March 27th

14 and some things on April 3rd, and that turned out to be nonsense

15 as far as I can tell.

16         So here is what I am going to do:  Mr. Albert, you can

17 provide to me and Mr. Liebowitz your billing records for the

18 application, and then I will let Mr. Liebowitz file opposition

19 papers, and then Mr. Albert, if he chooses to file reply papers,

20 and maybe Mr. Liebowitz will convince me that what sounds like

21 the -- pardon my colloquialism -- the plaintiff jerking around

22 the defendant was really more innocent than that.  So -- and I

23 am going to set dates.

24         Mr. Albert, can you provide the billing records in a

25 week?

PROCEEDINGS                                          30

```
 1            MR. ALBERT:  I am going to be in Italy with one of
 2  your colleagues next week, Your Honor.
 3            THE COURT:  How nice.
 4            MR. ALBERT:  It is going to be very nice, but how
 5  about when I get back, I am going to get back on Saturday, a
 6  week Saturday.  How about if I do it on Sunday and submit it on
 7  the Monday following?
 8            THE COURT:  Let's say by May 1st.  I don't want you in
 9  your jet lag to have to jump right on that.
10            And Mr. Liebowitz --
11            MR. ALBERT:  Thank you very much.
12            THE COURT:  -- if you get those records on May 1st,
13  how long would you like for submission in opposition?
14            MR. LIEBOWITZ:  I would say two weeks?
15            THE COURT:  Okay.  That would be May 15th, and then
16  Mr. Albert, if you want to reply, when do you want to do that?
17            MR. ALBERT:  I can do it by the end of that week, one
18  week, 5/22.
19            THE COURT:  5/22.  All right.  And, you know, if you
20  want to make this part of the subject of your discussions on a
21  resolution, that would be fine with me as well; and if that
22  happens, then you can just tell me that.
23            MR. ALBERT:  Thank you.
24            THE COURT:  But, you know, I really -- I have to
25  say -- oh, and, Mr. Liebowitz, by May 1st, also give me some
```

1  confirmation about your emergency on May 12th and because

2  otherwise, you might be paying for Mr. Albert's time on that as

3  well because I really -- I am sorry.  Did I say May 12th?  By

4  May 1st confirmation of your emergency from April 12th.

5        Because it does sound to me like -- and I don't say

6  this lightly, and I really regret it -- but it sounds to me like

7  we have a situation here where either the plaintiff is just

8  trying to run up the costs to the defendant in order to squeeze

9  a better settlement, or the obligations of handling discovery

10  matters in good faith were not taken seriously, and somebody is

11  just making stuff up as he goes along to have an excuse because

12  like I -- I really don't understand, you know, how you could

13  justify any of this behavior by a newly-minted relevance

14  objection.  You know how to raise a relevance objection.  So I

15  am unimpressed, but I hope you are able to --

16        MR. LIEBOWITZ:  So is the recommendation a thousand

17  dollars resolves this matter?

18        THE COURT:  I am sorry?

19        MR. LIEBOWITZ:  Is the recommendation a thousand

20  dollars I could go back to my client today and they would

21  settle?

22        THE COURT:  That's my recommendation.  I have no idea

23  what they will accept, but you two should talk about that.

24        MR. LIEBOWITZ:  Okay.  Great.  I can call you after

25  this?

1          THE COURT:  I am sorry?

2          MR. LIEBOWITZ:  No, I was just telling Craig that I

3   will call him after this is done.

4          THE COURT:  That's fine.  And so I am just going to

5   remind you of all the dates.  The plaintiff is going to sign the

6   interrogatories tomorrow or else it's going to be a hundred

7   dollars a day for every business day thereafter that they are

8   unsigned.  The document -- 100 percent of what's been asked for

9   is going to be produced, I think you said this week, and it's

10  Thursday, so that's tomorrow.

11         MR. LIEBOWITZ:  I -- can we make it Monday?

12         THE COURT:  Fine.  We'll make it Monday, which is

13  May 22nd -- excuse me -- April 22nd.  And the billing records

14  are going to be produced by May 1st; opposition by May 15th;

15  reply May 22nd, and confirmation of the emergency by May 1st.

16         MR. LIEBOWITZ:  Okay.

17         THE COURT:  And if you resolve the fee issue as part

18  of your settlement, you will let me know, but naturally, the fee

19  issue is Mr. Liebowitz's obligation, not the client's, and it

20  would be unethical for Mr. Liebowitz to compromise his client's

21  interests to get out from under his personal obligations.  So I

22  am sure that won't happen.

23         But if you want to quote-unquote "settle" the fee

24  issue to save both lawyers the work, you can do that, but I --

25  so I want to clarify that when I said if you want to settle it

1   as part of settling the case, I shouldn't have put it that way.

2   If you want to settle it separately from settling the case, you

3   can do that.

4           MR. LIEBOWITZ:  Okay.

5           THE COURT:  But it would be naturally completely

6   improper for Mr. Liebowitz to compromise his client's interests

7   based on his own.

8           MR. LIEBOWITZ:  Okay.

9           THE COURT:  Any agreement between the lawyers on the

10  fee issue would have to be completely separate.

11          MR. LIEBOWITZ:  Okay.  So just so I understand, so

12  obviously the settlement is filed separate, in terms of the fees

13  I could speak with Mr. Berger about that and try to resolve that

14  issue?

15          THE COURT:  Yep.

16          MR. LIEBOWITZ:  Okay.  Okay.

17          THE COURT:  All right.  Thank you both.  I will look

18  for your papers.

19          MR. LIEBOWITZ:  Thank you, Your Honor.

20          MR. ALBERT:  Thank you, Your Honor.

21          (Time noted:  1:01 p.m.)

22

23

24

25